number 22 60 77 sing versus let's say sing versus Garland but I think probably by operation of the rules it should be sing versus Bondi mr. rule if it pleases the court Jitinder Singh Garbal for the window sing this case raises the question of if the IGA is required to apply the Rams and me Shire factors when assessing the admissibility of a border interview especially where respondent has claimed duress now the IJ in his decision did not apply these factors we raised this issue with the BIA and the BIA in its decision argued that because the Rams and me Shire factors were decided prior to the real ID act that it was not needed right so right so you raise the issue the IJ said I don't have to apply the factors and the BIA also said we don't have to apply the factors right so even if we think the factors are satisfied we can't replace our reasoning for the reasoning of the agency right that's shattering right so so what about that argument why isn't it right that the real idea like the wrong some Shire factors were developed before Congress passed the Real ID Act the Real ID Act provides a statutory standard for adverse credibility terminations so why doesn't that override the judge made standards that we developed before Congress acted well I would turn to the case decided in 2023 I'm a villa Saruma 28 J letter about that but that that opinion was subsequently vacated so I'm not sure we could rely on that as a president I would argue that the factors that you think it's persuasive yes okay but I would argue that the factors that were relevant to develop the realms of me a Shire factors are still present today I mean aliens coming to this through a long trek so I don't see the agency is having completely rejected the factors it just says that you don't start with them and you know they're they're determinative rather it's part of the totality assessment do you say I would accept that that may be part of the totality of the circumstances but in the case here that I J didn't I would accept that I'd be acceptable it occurs to me that the only relevant Ramaswamy chief actor is duress here because there's no other dispute about him having made the statements at the border so my right that the only relevant factor is the duress factor I would not agree with what else what other factor do you think was relevant here so I would argue the first three including duress are relevant the second second factor is that were the questions designed to elicit the respondents asylum claim or sorry the aliens asylum claim that's not what was done the whole interview basically turned on how the alien entered the United States well there was no doubt about what his claim was at the border right he said he left India in April of 2013 he gave a detailed account of the route and the persecution before 2013 was there any question about what his 2013 claim was no and and that's what I'm saying there was no questions by the border agents as to what his claim was other than hey I have the factors okay so the first one is whether the record merely summarizes or paraphrases the alien statements or as a verbatim account and in this case it is a summary right because we only have the I 213 so we don't have a verbatim account and so that might be that it would implicate the first factor two is the questions act are not designed to elicit the details of the asylum claim or the INS officer failed to ask follow-up questions that would aid the alien in developing his or her account I guess we don't really know exactly what questions were asked because we don't have a transcript but you're set but your client said I was under the apprehension that I didn't need to give all the accurate details and so maybe if the officer had informed him of what would be helpful to him and not helpful to him it would have helped him develop his asylum claim I guess is what you would say and then the third factor is the alien appears to have been reluctant to reveal information to INS officials because of prior interrogation sessions or coercive experiences in his or her home country I don't know if it's because of prior interrogation sessions but it does seem like your client said that he thought it would not be his interest to reveal accurate details of his claim to the INS officials so he was reluctant to reveal them it seems right yes the smuggler told me it wouldn't be safe for you and also well that though was considered by the agency the agency considered that precise argument and found it not credible so to that extent I'm hard pressed to understand how you don't think that relevant factor was considered and rejected the reason why I say it needs to be addressed in the Rams and Me Shire factors it says based on prior interrogations right so that's one way here it's not based on a prior interrogation by the agency it's I thought your claim of duress was duress by the smuggler right so what I'm saying is that my client was arrested in his native country he was Mike mr. Singh was arrested in his native country mr. Singh was subjected to torture while in police custody so now he has an apprehension with law enforcement that's flows I mean there is this argument that was made about duress that he was under duress by the agent and the IJ did consider whether that was true and thought that it wasn't credible that he was under duress but the details of what he said was I was scared and nervous I didn't know how the process worked I thought that it wasn't in my interest to tell the truth but then later when my attorney before the hearing told me that I should tell the truth then I did tell the truth so I guess you would say apart from duress the wrong some of our factors would implicate just that concern about misunderstanding or misapprehension about what he's supposed to say when he encounters a border agent right and I would say it flows from his past experiences with law enforcement and that also couples in with the first requirement that there's a transcript because courts should be examining was the alien hesitant now we don't know if he was hesitant when he made his statements because there is no transcript so if a court's to properly assess even if I agree with you that if the Ramsam Shire is good law it means that before the IJ relies on the border interview for an adverse credibility determination it needs to go through the factors and decide that it's reliable for the purposes of making an adverse credibility determination that seems consistent with what Ramsam Shire says but again you know the BIA points out the Real ID Act has a presumption in favor of considering any inconsistencies in the record whereas Ramsam Shire seems to operate on the opposite presumption it seems to say you should be wary of relying on a border interview until you assess it for all of these indicia of reliability so if Ramsam Shire says you should be concerned about it but the Real ID Act says it's presumptively reliable isn't that a conflict and doesn't it mean that what Congress said later should Trump what I would argue is that the reasons why Ramsam Shire was implemented right aliens coming from from a dangerous trek may not be in the best position to be forthright due to their own personal experiences and so I get that that's the argument of Ramsam Shire but you could imagine the rationale going either way right it could be you'd say oh the border interview was less reliable for credibility because they are have gone through a stressful situation and they don't know our legal system or whatever you could also think actually they're going to be especially honest when they're met at the border because they haven't strategized with lawyers or developed a you know a theory by which they could get asylum or whatever so it's not obvious to me that just the inherent nature of the interview means that we should have one rule or the other but just in terms of the legality of it if we think that the judge made rule before the Real ID Act said we should presume that it's not reliable until we test it for reliability and the Real ID Act says everything is presumed to be admissible unless it fails the substantial evidence test but shouldn't we go with what Congress said later as opposed to what courts came up with before well I mean if you when answering that question if you could also address what we should be doing about the BIA precedent of JCHF which in my view incorporates and serves as the basis for the Ramos on the chair factors so how does the Real ID Act the BAIA's own precedent and the substantial evidence standard all interplay in this case well what I would say is to make a proper assessment because the realms in the shire is trying to figure out if this test for the statement or you know the interview should be put into the record and one of the main issues is is this a transcripts transcription of what was said or is it a summary if it's a summary then it leaves much to be desired because you don't know how the alien answered what were the issues I mean this interview was an hour and a half and we have a paragraph so there's many things to be desired that may have you know be missed and that's why it shouldn't be admitted to the record I think you can argue that maybe perhaps the first factor of it being a summary versus is very very important but what do we do about the fact that even if they weren't going through them they were actually considering them the totality of circumstances that judge judge Raji mentioned earlier right and you would weigh them weekly you would give less weight to it and you said then the question then is what was not supported by substantial evidence the fact that respondent was under duress from his agent and may have by the agent he was under duress by the agent that's what he said his agent that facilitated his entry into the United States. Does that require us extending the definition of duress I understood his statement to be he was concerned that it wasn't in his interest he was concerned that he couldn't trust them and even to your point that he wasn't illicit information is that the same thing as distress because Pumavia actually involved someone who was affirmatively scared because they had been violated by another agent. Yes it was a US agent but in mr. and I would say it's the effect not the cause right in mr. Singh's case he's been tortured by Indian law enforcement and he has fear flowing from that. So he has fear of the agents maybe for that reason but you were talking about duress by the smuggler. Right. I guess just because the duress maybe the terminology is kind of distracting you're not saying it's duress in the sense that you could make out a duress defense to a crime that like I killed somebody because I was under duress you're just sort of saying he was under coercive pressure like the agents seem to tell him if you tell him the truth you're gonna get returned to India which you don't want to do and that's the thing that's gonna be bad that happens to you and so because that's what he thought was the circumstances he felt pressure not to tell the truth. Correct. It's a kind of duress in a colloquial sense even if it's not like a classic duress defense to a crime. Right and understanding what would have happened to him in India based on his experiences there it was sufficiently weighing on his mind when he when he did give this interview and that's why we don't as we've recognized there is no transcript and we don't. I have a number of questions and I think the first few are to ensure that I understand what the client's claim of duress is here. Let's talk about the Indian authorities who tortured him, the smuggler who told him to lie and the federal agent who interviewed him. Now I understand that your client is saying he was tortured and feared what would happen going back. I understand him saying that the smuggler told him to lie. I'm not sure what you're saying or your client is saying the federal agent did that constitutes duress. Help me out. Sure and that's when I turn to the third factor of the Ramses Meem Shire test which says if an alien has a history of being persecuted it is understandable that they may be reluctant to be forthright with US law. Well that's not duress. That's not duress by the agent and a moment ago you said he claimed he was under duress by the federal agent and I'd like to know where in the record there's such a claim. So I apologize I meant agent as in his smuggler. Let's call him the smuggler. Now when he's interviewed by the federal agent he lies. There's no doubt about it. He now says that was a lie what he told the federal agent, right? Correct. Under Ramses Meem Shire isn't the only question then? Well did he lie under a duress that makes it excusable? That's the only question isn't it? Right and that's it's not a matter of what was he asked you know was the question subtle or not. So why did he lie? Right but I would argue that it was were the questions that were asked of him in a way that would elicit his claim which would then show and he would then be more inclined to tell. So if the agent had pressed him he would have found out that the the problem had occurred later rather than 2013? Yes because that's his claim. Oh so the agent should not have, the fault here is that the agent bought the lie. No the fault is the agent didn't ask questions eliciting his claim which is required under. So it doesn't have to be fault right? I mean the theory of Ramses Meem Shire is if you come to the border and you have experienced personally purportedly have experienced persecution and you've been through a long journey it might be that you're just not going to tell the truth over the circumstances or be reluctant to tell the truth. And so when we talk about reliability it's not about assigning fault it's about deciding whether it was a reliable basis for adverse credibility determination. So you're just saying under the circumstances it makes sense that he you know if you have two conflicting accounts the one that he says later not at the border is more reliable and so should be credited. Unless the IJ had gone through all the Ramses Meem Shire factors to decide that he could rely on a border interview which here not only did the agency not do but the agency said it wasn't obliged to do. Well let me go back to my questions then. With respect to this my concern is that if what you're urging is that when a border agent hears an account and your client's account was quite detailed I mean when he talks about leaving in 2013 he talks about where he went he talks names of people who helped him etc. The agent should be skeptical of that and press him for the possibility that that's a lie. Is that what you're saying? No your honor. That's not what I'm saying. Because I would be concerned that that would be claimed to be duress that if you pressed him to give you a different version. So what should the agent have done here? The agent should have asked questions that solicited his persecution. He's got a detailed account of that persecution happening before April of 2013. It provides a detailed account. I mean if that were true if the account he gave were true you'd be saying he was entitled to relief from removal or to be granted asylum. So in the 2013 form the detailed account and forgive me if I'm incorrect the detailed account is as to how he entered the United States. There's only two lines that address his claim of persecution where he says I was persecuted I was escaping persecution and that you know he was a part of a political party that was discriminated against in India. That's the extent. So the big question for us is what do we do about matter of barsoness which says that unless there's an indication that it's incorrect because of coercion or distress we should be considered it should be considered. And I think part of where I'm struggling is that you seem to be collapsing point number three which is did they ask questions that would elicit it with the overall reliability and you're not hooking up how three relates to four which is whether or not he was actually under coercion or duress. I mean because as I think Deirdre has intimated if the border agent has no reason to not believe what he is being told or she is being told is true they don't know that they're not asking the right questions. Right so like how do we make sure that we are not overly with post hoc eyes like with eyes after the fact being able to explain what should have been happening in that particular incident without a coercion or duress. Right so what I'm saying is that and what I understand and forgive my ignorance that when the Ramshami Shire factors are applied to an alien they're designed to see look is this alien inclined to be for right. No I mean I think most people would read Ramos on the chart as how reliable is the the interview at the border and and when it is unreliable are you explaining away why that doesn't have to lead to an adverse credibility finding or why that's not a substantial basis for an adverse credibility finding. It doesn't set a fact finding standard it does not impose new requirements on border agents it is merely when you're trying to weigh whether or not there was substantial evidence is there a reason for not having a adverse credibility determination because there is something unreliable about what happened at the border. Right but when the the transcripts aren't there when when when you have a summary of what was said and when you have an alien who has a history of persecution by law enforcement I think we recognize or. No but then at that point then are we are we really just having an argument over whether or not you disagree with the weighing of all of those and whether because you're not you're not at this point explaining you're explaining why some judge might consider this is an excusable explanation for why the border interview is not reliable and also why it might not be credible but there's also another interpretation which is the person wasn't telling the truth. So what we're not trying to do is we're not in a position to be able to say unless you can show that there's not substantial evidence for the conclusion that the BIA and the IJ reached as opposed to giving an argument perhaps a persuasive one about why a different outcome could have been reached and the part that I think is the hardest right now is I am not understanding as to whether or not you are asking us to extend our understanding of coercion or duress. To a situation where a person was scared or to him or when a person was misadvised by a smuggler. I'm arguing that the factors that were that are outlined in this in this in this test they're designed with the intent to allow courts to examine if that interview should be admitted into the record and it's right. All right, so your argument it's not that the Ramsam Shire factors do anything to micromanage what the border patrol agent does at the border. The question is when the IJ is looking at the record before him to decide whether the alien is credible and has testified consistently, we said in Ramsam Shire before you rely on an inconsistency with a border interview, you have to go through the factors of – or the indicia of reliability of the border interview. And if you don't do that, that's a procedural error and like you shouldn't have relied on the border interview to make that adverse credibility finding. And here the IJ not only didn't go through the factors but said affirmatively I don't need to go through the factors, right? Correct. And we're hung up on this idea about duress and coercion but if you read Ramsam Shire it does say that somebody might be scared and flustered based on a long journey and that's a reason why you might not rely on the border interview for adverse credibility determination. Correct, in addition to past experience. Sort of what Ramsam Shire says on its face, right? I'm saying in addition to its past experiences with law enforcement is a factor that should be weighed in the fact that the alien may not be forthright. Right. So I don't – so from my perspective, it does seem like that is what Ramsam Shire requires, but the agency said it didn't need to follow Ramsam Shire because of the Real ID Act. And I asked you before why doesn't the Real ID Act trump, and I'm not sure I got an answer. So if Ramsam Shire says you can't rely on the border interview as a basis for adverse credibility finding unless you go through a certain list of factors, but the Real ID Act says and IJ may rely on any inconsistency in the record no matter where it appears, why doesn't that mean that Congress has said we want a different standard? And since Congress enacted the Real ID Act after we articulated the Ramsam Shire factors, that's the later and more authoritative standard. And my argument to that is Ramsam Shire addresses should this be in the record, whereas the Real ID Act addresses what's in the record. And that's where I think we're saying that this should not be in the record based on those things. Well, it's in the record. This form I-213 is going to be in the record, right? The Ramsam Shire question is whether it can be the basis of an adverse credibility determination, right? Right. Well, I guess I would say it diminishes its weight because of its lack of clarity. The 213 without all the details that would be needed to make a decision for an incredibility finding. I mean, there are details lacking and I don't think we can, even for myself reviewing what was said, I don't know what was said for that hour and a half. All I know is there's a paragraph about his adventure to come to the United States and the events basically that he was persecuted and he was part of a political party. That's all I know. I can't review was he reluctant, was he trying to answer, was it clear that, you know what, he's under- No, I get that. I get that analysis that you're saying that Ramsam Shire requires. Okay, you've reserved time for rebuttal, so we'll hear from you again, but let's turn to government. Mr. Callahan. Thank you, Your Honors, and may it please the Court. My name is Brandon Callahan on behalf of the Attorney General. Your Honors, I think we need to be careful when we consider this case not to read in things into the record. With absolute respect to my opposing counsel, he's told you today that Mr. Singh claimed duress. The brief has said that Mr. Singh was threatened by the illegal smuggler who helped him reach the United States. None of these things are supported by the record. As Your Honors noted, when he was questioned by Border Patrol, he told them that he departed India in April of 2013, and then he told them about an eight-month odyssey across six countries involving many people, long stays. He even gave code names for some of these people, both a boss and 11. And then when it came to his hearing, he changes- Yes, Your Honor, but what he- Yes, Your Honor, but- Okay, so the agency said that, right? And if the agency is right, then the agency wins. But if the agency is wrong, doesn't it mean that it needs to go back for the agency to apply the factors? Well, is that right when the agents – the board acknowledged that he was scared? The board reasoned that he provided a detailed and specific account, and the board said that he didn't specifically explain on why he was exerting duress. I mean, it seemed to me under the BIA precedent, they applied the factors even if they didn't indicate that they had to. Yes, Your Honor, I would agree that the board and with reading the IJ's decision- I'm sorry. I mean, you agree it's a fundamental administrative law principle. We can't replace our own reasoning for that in the agency, right? That's Chenery Law. Of course. Right. So if the agency says we do not need to do the Romsom Shire factors because the Real Idea Act trumps, which you would read to that that's what the agency said, can we really go back and say, well, even though that's the agency's reasoning, really if you look at what the agency was doing, it was really doing this other standard that it had disclaimed. I mean, wouldn't that be a violation of the principle? We can't substitute our own reasoning for that in the agency? I think something that overt would be, Your Honor, but I think JCHF is the critical component to all of this because what JCHF tells the immigration judge and the board they have to do is consider any issues raised relating to the reliability. The BIA in reviewing the IJ's decision cited to JCMF and said that that's the rule, at least, that controls IJ's and it found it satisfactory because he had considered duress. Is that right? Yes, Your Honor. Now, let me just be clear on this. Perhaps I knew this and forgot. The IJ's order comes down in July of 2018 and JCHF is a 2018 decision. Had it already come down when the IJ ruled or is it later than the IJ's ruling? Your Honor, it came out in February of 2018. So the IJ should have known about it. Yes, and as I say- It does acknowledge that the agency itself has said that the factors listed in Ram Samachiri are properly considered and that so it doesn't reject the wholesale. It just says they're part of the totality analysis. Yes, I agree, Your Honor. I think that- That's the standard that the BIA used in reviewing the IJ's ruling. Yes, Your Honor. They considered the totality of the circumstance. They were working to address any issues that might have been raised.  So I agree with that. So if it's right to rely on JCHF, then it's right and it should prevail. But if you read JCHF, what it says is the Second Circuit in pre-Real ID Act precedent articulated these factors that it said we needed to consider before relying on a board interview to make an adverse credibility determination. But since they articulated those factors, the Real ID Act came down. The Real ID Act provides a new standard, totality of circumstances. We'll consider the factors that the Second Circuit identified as part of that analysis because it's appropriate to consider, but we're not required to consider any particular factors, right? Yes. So it doesn't say we're just going to ignore them entirely, but it does say it's no longer a mandatory list of factors that needs to be required before relying on a board interview, right? Yes, Your Honor, and I think that that's- Okay, so I get it that you're saying, well, technically they're taking into account some of the factors, but they are making the following change, which is before the Real ID Act, it was basically a procedural requirement of the agency to do the factors before relying on the board interview. After the Real ID Act, it's a legitimate consideration, but really the test is to tell it the circumstances. It's not a mandatory list of factors, right? Yes, Your Honor. Okay, so then maybe you're bristling at my saying that the Rahm Sumter is just not good law. Maybe Rahm Sumter is just transformed by the Real ID Act into sort of legitimate considerations but not mandatory. Is that right? The explanations are articulations of what the totality includes. Yes, Your Honor, I'm not bristling at your description at all, and I would agree that I think that JCHF says that the Rahm Sumter factors are certain types of factors that could be relevant in assessing the totality of the circumstance, and so what we have- But there are pre-Real ID Act cases in which we have vacated a BIA decision just to say you relied on a board interview, but you didn't go through the Rahm Sumter factors, therefore you erred, and so we're going to vacate and remand for you to apply the Rahm Sumter factors. You would say, and the board after JCHF would say, you can't do that unless you determine that there just is no- You apply the substantial evidence standard. You have to determine that there's no substantial evidence for the determination. You can't say that you failed to do a list of factors. Yes, Your Honor, I think that that's absolutely right, that the JCHF is clear that post-Real ID Act there isn't a preset list of factors that have to be discussed, and respectfully, I think that what we have from this court would agree with that, because Poma v. Zuruma was vacated on exactly that basis. So I think that JCHF is- That's what the DOJ asked for rehearing on, but the- Right. Yes, Your Honor. But I think that JCHF is the linchpin between Your Honor's question and Judge Perez's question, because it's not a Chenery violation. It's just assessing the totality of the circumstances and the only issues raised, but I do just want to bring the court back to- Right, so you're right. So it's not a Chenery violation if the way we think about the factors is what we just said, which is it's no longer mandatory. It's just part of the substantial evidence review. Right. But if we thought about it the way we thought about it before the Real ID Act, that it's a mandatory list of factors, then we wouldn't be able to say now, well, you did it really in substance, even if you disclaimed- Right. I would agree with that, Your Honor. I do just want to take the court back to exactly what he told the immigration judge about this, I would argue kind of vague, possible statement of duress, because on page 94 he said that the agent, excuse me, the smuggler, told him not to say correct things to anyone, quote, because it will not be good for us, presumably meaning the illegal smuggler, and it will not be good for you. That is not a direct threat. That is that it could easily be said it's not good for the federal government to know about our illegal smuggling operations, and you would get your claim denied and sent home if you told them the truth. Well, right, but so I understand that that's not maybe a duress defense to a crime, but that's not what Romshoffshire is about. It's not about like a duress defense. It's just about whether there are reasons for thinking that he wouldn't be telling the truth at a border. Correct, Your Honor. So if he's under the misapprehension that if he tells the truth about the date of his persecution and all of that, he's going to be sent back, that would be a reason for thinking that you shouldn't rely on that for an adverse critical determination because there's a reason why he wouldn't tell the truth there and he would tell the truth later. Yes, Your Honor. I think that being under misapprehension is one thing. Duress is another, and that is not a statement that he was under duress. No, but that's what I'm saying. He's using the word duress colloquially, not to mean it's like a duress defense in the criminal law because we're not dealing with a criminal case. No, of course. So if I tell you I want you to do something, and if you don't do it, I'm going to deport you to a place where you think you've been persecuted, you would feel some duress, right? I guess, but only from the normal operation of the law. It wouldn't be from the agent. Then on 95, he says the agent told me do not tell correct things about us, the illegal smugglers. It would be a reason why you would do the thing because you wouldn't want to be deported. Well, if I could just, Your Honor, on 96, DHS counsel asks him, what would happen if you didn't listen to the agent's instructions? He didn't answer that question. He just said I was already scared and I followed instructions, but he doesn't even say that he's scared of the agent. He could have easily been, as Your Honor's questioning illuminates, just scared of the process. And so that's not a showing of duress, and quite frankly, quite a lot of noncitizens are scared of the process, and I can relate to that. That's what I'm just sort of saying. I mean we had this exchange about what Ram Somshire requires after the Real ID Act, and so I have your position on that. But like if Ram Somshire applied with full force, Ram Somshire does talk about more than literal duress. It talks about coming after a long journey, being worried about skeptical authorities, being concerned about them, being worried about being returned, and so therefore – and not being familiar with our system, and therefore there might be reasons why it's not a good basis for adverse critical determination. It doesn't say it must be such a level of coercion leading to a duress defense, right? But in this case, the BIA found that it wasn't sufficiently explained, right? Like the BIA said that they didn't give enough reason to give credence to the fact that the fourth prom had been met, right? Yes, Your Honor. I do see I'm out of time. If I could just – okay. Yes, the BIA did discuss the relevant issues relating to reliability. I also think it's important to remember that the immigration judge made a specific duress finding a fact. He said, I believe it's on page 41, I quote, I do not find any evidence that respondent was under duress at the time. So going back to Judge Perez's question and my colleague, the question becomes is there substantial evidence to support that, or put it differently, does the record compel a contrary finding? And I think based on what he actually said, not the way we would want to characterize it, but what he actually said – I'm not even disagreeing, right? So if – let's say we – so if we live in a world in which, as you described, the Romson Characters are just part of the totalitarian circumstances and are really operating under the pure substantial evidence standard, then if he says the reason why you shouldn't rely on the board interview is because I was under duress, the agency should consider that claim of duress. And here he makes a finding that he wasn't under duress. But if we lived in a world in which the Romson Characters required a kind of checklist of factors before you rely on a board interview, then the IJ would have to do more, right? Not just consider duress, but consider all of the factors to decide whether this was a reliable basis for an adverse credibility determination. Well, I thought he had argued that in some ways they did because it's been incorporated into GCHM. Yeah, I think that the Romson Characters are fifth pronunciation for the day. I actually had someone who was Tamil tell me it's Ramasamachar or Ramasamachari. I really appreciate that. It's going to be very difficult for me. I think that they are examples of something – of things that could be relevant in certain cases. But I think living in a world where the Ramasamachar factors have to be discussed every time is not the world we're in anymore because of the post-ideal idea. So if, in fact, the poem of Viyasaruma view that it's mandatory if there's something in the record that suggests that the factors might be implicated, the agency did not do that here, right? They didn't treat the Ramasamachar factors as mandatory. No, they didn't treat the factors as mandatory. No, Your Honor. And so I think just – if I could just wrap up on the issue of whether the record compels a contrary conclusion, we have just these – If I let you do that, then I want to ask you a question. Thank you, Your Honor. I appreciate that. I appreciate that, Your Honor. Going – just looking at the kind of vague statements that he did give the immigration judge about what he was feeling and what kind of duress he might have been under, combining that with what we don't have here, right? Because we don't have any explanation for why the agent would have wanted him to provide false information, how the agent would have known if he didn't, which the board notes because these proceedings are confidential, what consequences would have been if he gave correct information, which DHS counsel asked him and he refused to answer? And then why did he stop fearing them? I get all this. You made this argument about he's not literally under duress. You're acknowledging that the factor – you're saying the factors are not mandatory. He thinks the factors are mandatory because he thinks the Real ID Act didn't change them. So if it were true that it was mandatory, wouldn't he be able to say it's not just about literal duress. It's about any reason why he would be nervous or misunderstanding or not totally forthcoming in the board interview. And so that's why you need to do the factors, right? It wouldn't just be about literal duress. I guess, but I think that that would be a very big expansion of the term duress to get to Judge Perez's earlier point. And I think if we were looking at the – Is he really – I mean in fairness, is he really describing duress? Like he's not saying – I would argue no, Your Honor. Right, but he is saying I was scared and nervous. He told me I'd be deported if I told him the truth. I mean that's duress in a sense. Like he's worried about those consequences. Yeah, but I think that that's just duress in the sense that he's scared of the consequences of being in immigration proceedings, the effect of the – But actually the truth is he believed the exact opposite thing. If he had been truthful, it was more likely that he would get immigration relief than if he was not truthful, right? It might have been more likely. It was a misunderstanding. It was because he wasn't familiar with the way the process was going to work and play out. Right. So I think if we expand to that level of duress, then we're really talking about kind of at least most, if not every case where the noncitizen is concerned about the outcome of their proceedings. But I think that if we look to the actual language of Ram Samasheer, if we were going to live in this world that I would argue is not the world we live in where Ram Samasheer has to be discussed in every case, the only criteria that this really fits in is number three, whether the noncitizen appears to be reluctant to reveal info. He was, as Jajaraji pointed out early on, not at all reluctant to talk to Border Patrol. He gave them a long recitation of everywhere he'd been and all the things he'd done. And so there's really no – If you read Ram Samasheer, it says, because the interview takes place immediately after an alien has arrived in the United States, often after weeks of travel and may be perceived by the alien as coercive or threatening depending on his past experiences. It says, I mean, it is true he was worried about telling them the truth because he was worried about the consequences. I mean, that seems to be the reasoning of Ram Samasheer. I mean, again, I would argue that probably all noncitizens trying to immigrate to the United States are worried about the outcome. Congress stepped in with a different standard, but that does seem to be what it said. I agree, Your Honor, that that is the language in Ram Samasheer. I'm simply pointing out that there's really no evidence that he was reluctant to speak to Border Patrol. And I did just really quickly want to address – But he was reluctant to tell them the truth, right? You don't disagree with that? Well, I don't disagree that that's what he's told us, yes. I did just – I'm sorry, Judge Raji. Yes, you told me a few minutes ago you wanted to –  Given the view that at a minimum the Ramachera factor should be considered as part of a totality analysis, if someone came into the border and said, A, and at their later hearing said, B, and said, I was exhausted and therefore I wasn't really focusing on the question, it was all a mistake, that would appropriately be considered. Is that right? I would agree with that, Your Honor, yeah. It's relevant to the reliability. If someone comes into the border and says, A, and then comes to the hearing and says, B, and says, my English isn't so good, I didn't have an interpreter, and I didn't fully understand the questions, it would be appropriate to consider that. Is that right? Yes, Your Honor. I think anything relating to the reliability of the Border Patrol interview. Let's get closer to this case. Someone comes in and says, A, in considerable detail, then has the hearing and says, B, which is completely at odds, indeed off by several years in it, and says, I lied, and I knew I was lying, and the reason I lied is because the smuggler told me it'll go bad for us if I say it and it'll go bad for you. That's what gets considered, isn't it? Not whether he was tired, not whether he was confused. You consider what he says is his explanation for a knowing lie. Is that right? Yes, Your Honor. I would wholeheartedly agree. That's what the IJ did here. I would agree with that completely. All three of your scenarios illuminate that what needs to be discussed are the issues raised with the reliability of the report, and the reliability issue here was this. I'm not saying that confusion or exhaustion or whatever are never relevant. They're relevant depending on the particular scenario that you've got. This is not such a case. This is a case in which someone is now telling us he knowingly lied. Yes, Your Honor. I think that's accurate. The JCHF is pretty clear that the IJ has to consider any issue relating to the reliability. The issue here is these kind of vague statements that he might have been under duress, which the IJ— Your answer is an application of JCHF. So you're saying, yeah, you consider what he raises and the arguments he makes if you're just applying substantial evidence to tell us the circumstances. Well, do you think Ramazan Khiri ever required you to— if somebody is telling you they lied and they lied because the smuggler told them to, that then you have to consider, well, how tired were they? Well, how confused might they have been? Do you think that's what Ramazan Khiri ever required? I understand the question, I believe, and I think that the answer kind of lies in Judge Menashe's earlier question or note that the court prior to the Real ID Act had vacated and remanded for strict adherence to Ramazan Khiri. So I guess before the Real ID Act— It did require mandatory factors, but now it does not, you're saying. Right, yeah, I think before the Real ID Act, maybe, yes, but now that we have the Real ID Act and we have JCHF, no, there's no requirement that whether they're tired be considered. What's required is what they raised, and we have the immigration judge doing that here and a specific finding, and so the question just becomes, does the record compel a contrary conclusion? And respectfully, I don't see anything here to compel that conclusion. If I could, just before I go, I just want to address my colleague's argument about the first Ramasheer factor that we don't know, it's not a verbatim transcript, and I think that that's a very dangerous line of argument because then it gets to summaries or paraphrases could never be the basis. They would always fail that factor to whatever extent that it's relevant, and any summarization would be an issue to be discussed in every case, and that's an extremely broad thing, especially in a case like this where he's not disputing that he said these things. Yeah, I mean, if we apply that factor, I'm not sure what it would mean that you automatically don't rely on it if it's a summary. It just means that if it's a summary, it triggers special scrutiny, right? I think that that would be a more reasonable way to apply that. Or maybe in some circumstances it would be more relevant if the question was an omission that seemed to be obvious as opposed to a contradiction based on someone knowingly why. Yes, exactly, Your Honor, or if the non-citizen had said to the immigration judge, well, that's not really what I said to Border Patrol, or they missed this part of my statement or something like that. But I did tell them, and it's not reflected there, and I don't know why. Right, exactly, which we see cases like that, but this isn't that case. Everyone's agreeing that Mr. Singh said these things and that they are in flat contradiction with what he told the immigration judge and actually render the entire basis of his claim implausible. So I just wanted to note that for the Court, and unless there are any further questions, we would just ask that the Court I mean, if so, like, I understand that you're saying the record doesn't compel the conclusion, but if the IJ thought, all right, I'm persuaded that the only reason you said that at the border interview was because you were misinformed about what to do by the smuggler, and I think because your later account is more substantiated and more consistent and that's the true story, and therefore I'm not going to make an adverse credibility determination, that would also be a reasonable decision, right? I think so, yes, Your Honor. The immigration judge is the finder of fact about the question of So it would be possible to say these reasons he gives for why he said something different at the border interview could have been credited by the IJ, and it would have led to a different result. Oh, yes, I think it's certainly possible that the immigration judge could have accepted the explanation. He didn't in this case, so our question just becomes does the record compel you to reverse that, and I would argue no, so unless there are any further questions, the Attorney General would ask that the Court deny the instant petition. Okay, thank you very much, Mr. Callahan. We'll turn back to Mr. Ruhle on the rebuttal. On rebuttal, I want to ask or present a scenario. An alien fleeing a country where he or she is being persecuted arranges transportation to the United States and is given a fake passport. The passport has a different name on it. The smuggler informs the alien, you better say you're this person or you're coming back here. The person uses that passport, comes to the border, says I'm Mr. X, even though he's not, and then later on, once in the country, claims asylum and then acknowledges he lied, that hey, I was trying to escape persecution. I got this document. I knew it was fraudulent. It was a lie, and I told a lie, but I want to come truthful now. What would happen in that scenario if we're looking at lying to border services as basically ending anyone's asylum claim? The question would be whether or not the IJ credited that to mean that it was reliable or not reliable. The IJ is trying to determine whether or not the asylum or the torture claim is reliable and how much unreliability or not being truthful earlier speaks to that, and that would be done by a totality. The IJ doesn't immediately have to find that just because they said something untruthful earlier that whatever they're claiming about asylum or torture isn't true. It's just one of the bases, and then your burden would be to tell us that there was substantial evidence not supporting whatever adverse conclusion that the IJ made. So, dude, bless you. Now, the IJ in this decision doesn't speak to the persecution of Mr. Singh in his native country. He finds him incredible, but he doesn't speak to, you know, this didn't happen to you. Well, he does speak to it, right, because he says, I don't find you credible because of these inconsistencies, and so therefore I'm not going to credit your story about persecution, right? So he does speak to it to that extent. Right, but it's not looking at exactly what Mr. Singh has said. It goes to future persecution, and it stays basically on the fact that you're incredible, and thus I'm filling up. Well, he has a separate analysis about future persecution because he says, you know, the Indian government's not going to be aware of his activities in the U.S. and all of that. That's a separate question. But on this question about past persecution, that is a way to address it by saying I don't find you credible because of the inconsistencies. Right, and what I'm basically trying to say is if someone, again, came with a passport, that was a lie, would that be ground? And if the, I mean, the IAJ just says I don't find there was duress, and then it's the BIA that kind of adds to it saying that, you know, the information that the alien provided wasn't sufficient. But the IAJ doesn't explain why he doesn't find duress. It's more the BIA kind of adding into that finding. So my concern is that. I mean, there will be. So I heard Mr. Callahan say that if we were in the pre-Real ID Act world where we treated the factors as mandatory, then maybe you would have an argument that they had to go through the factors, regardless of the specific argument he made, which is require them to go through the factors before relying on a mortar interview. But after the Real ID Act, where really it's discretionary, it's all about totality of the circumstances and substantial evidence, and so we don't have to go through any kind of mandatory list of factors. Why isn't that right? Like why isn't it the case that now that we have a statutory standard that says you can rely on any inconsistency in the record, the BIA's decision in JCHF has got to be right that there isn't a mandatory list of factors to be considered. I would argue that, well, one, why were those factors first implemented? And I guess legislation has addressed that it should be, you know, narrowed in more. But my argument would only be there would be many people that may be fleeing persecution and using fake IDs to enter at the risk of being sent back, and the fact that they lied to a border agent, and that's the only reason why the IJ finds him incredible. That lie would warrant a denial of one's asylum claim and found to be incredible. I think that would be very dangerous to individuals fleeing persecution because many people may use fake documentation and not know that they can come to a border agent and explain what was happening and that this is not me. I mean, they may use it in different countries, and that's how they got to this country. And that's where I think this case may impact a wider area of individuals than just Mr. Singh. Mr. Singh has said, look, I lied. I was told to lie. I mean we think that using the passport shouldn't be – the fake passport shouldn't be disqualifying. But I guess you'd say we also should vacate here because he says even if he's right that he was only lying because he was told to do so by the smuggler, it shows a willingness to lie because he was lying in somebody's direction and he lied to the IJ as a result of it. So I guess the equivalent in your passport example would be an IJ saying he came, he showed me a fake passport, and he told me that it was genuine, and that was a lie, and that makes him not credible. I don't know. Why can't that be – in your hypothetical, why couldn't that be the conclusion of the IJ? Why couldn't he just say he came with fake documentation, he came in front of me, he said it was genuine, that was a lie, therefore he's not being truthful and I find him not to be credible. Why would that be a troublesome result? Well, he wouldn't come before the IJ in the example. It would be before the border services when he's trying to enter. He came to the border, he showed the border a fake passport, the border agent a fake passport, he said it was genuine, that was a lie, it shows that he's not truthful. But that he's honest to me and he's confessed that this was a lie. The only reason why I would raise this is that that is a means that many persecuted people do use to escape persecution. And then when that comes up, then the question becomes, was there substantial evidence supporting the IJ's decision to either grant credibility or not grant credibility? I mean, you're not asking us to come up with a per se rule or create law that says you're never entitled to look at fake documents and make a finding on those bases, right? Like, that's not what this case asks us to do. What I'm trying to draw is that they're parallel. I mean, they're one and the same. Yeah, it's the same. So the IJ does say, even if the reason he lied to the border agent was because of his explanation that he was worried about being sent back, he just wanted to get into the country and whatever, that still shows that he's not truthful and I'm not going to credit his testimony. So that is the equivalent of using a fake passport. So if we think that there's a principle that you're allowed to lie to border agents to get into the country and still get asylum, maybe we should vacate. But I'm not sure that that is the principle. What I would say is we should take this, you know, in the totality of the circumstances and the case-by-case basis in the sense that, you know, it is reasonable that people fleeing persecution may use fake documentation. But that's not what Ramsamateria is about. Ramsamateria is about whether or not the border interview should be taken into account in terms of whether it's a reliable exchange. And it may not be reliable for any number of reasons, one of which is that the person is under duress in the classic legal sense of the word. They're going to kill his mother, they have threatened his sister, whatever. It may also not be reliable because the person has just traveled some incredible journey and is exhausted and therefore may have been confused by the questions. Or he may not be familiar with the language, there wasn't an interpreter, and he may have misspoken. We take all those things into account. I don't know how you suggest that Ramacheri excuses bald-faced lying. And that's what it seems to me this case has. You know, you want to say, well, there was a reason why he lied. Well, there's a reason why criminal defendants sometimes lie on the stand, but the law has no tolerance for it. So I don't know how you think this fits within Ramacheri's concern, not about whether your client's statements are reliable, but whether the border interview was reliable enough to be taken into account. Not determinative, necessarily, but we don't want it taken into account at all. That's what Ramacheri would allow. So help me out with how a bald-faced lie, not under legal duress, but just because he thought it was in his interest, it was going to be better to get asylum if he lied about it than he didn't, how do we tolerate that? And I want to speak to what Mr. Singh stated. Mr. Singh stated that his agent informed him, and this is the smuggler, smuggler informed him that it would be bad for you. It wouldn't be good if you told them the dates of entry, and Mr. Singh was concerned with that. And he thought that makes sense to me. We need to also take into consideration Mr. Singh's education, Mr. Singh's background. Mr. Singh was a farmer who had a high school education from a small village in Punjab. So these are factors that we need to understand. So where does Ramacheri say that what you consider is whether the person has an excuse for lying that's even short of duress? I would argue it's the third point. The third point in the Ramachari statements were that is the individual or the alien reluctant to be forthright due to past persecution or prior history of interrogation. But what you've just told me is that the reason he was reluctant is the smuggler told him it will go better for you and better for us if you lie. He didn't threaten him with anything. He didn't suggest that there would be any repercussions. As I understand what your client proffered, what you're proffering is your chances are better. Right. And I think the consequences of worse chances is persecution back in... I take it the argument you're making is he alleges that he was kidnapped by the police and beaten and urinated on and abused in various ways. And so when the smuggler says you have to withhold certain information from the border patrol agents, which are another form of police officers, otherwise it will go badly for you, he could have been scared about what would happen if he didn't follow that advice. And that's an explanation for why he gave the information he gave. And where is that in the record, that he analogized the federal authorities to the police who had beaten him? No, he says I was scared in the record, that, hey, I was scared. I think I understand your argument. Okay, thank you. Thank you very much, Mr. Gruhl. The case is submitted.